Melvon C. Miller v. Commissioner.
Miller v. Commissioner
Docket No. 1188-62.
United States Tax Court
T.C. Memo 1964-305; 1964 Tax Ct. Memo LEXIS 33; 23 T.C.M. (CCH) 1888; T.C.M. (RIA) 64305; November 20, 1964
Marvin S. W. Swire, 770 Pittock Block, Portland, Ore., for the petitioner. Walter John Howard, Jr., for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1958 in the amount of $6,066.70. The issues are (1) whether a portion of the proceeds received by petitioner from the sale of his armored car business represented a payment for goodwill or a payment for a covenant not to compete; and (2) whether respondent was correct in disallowing the depreciation claimed by petitioner with regard to certain depreciable assets in the year they were sold for an amount in excess of their undepreciated cost. Findings of Fact Some of the facts have been stipulated and they are so found. The petitioner is *34 an individual whose office and residence during 1958 was 1305 S. E. Belmont, Portland 14, Oregon. The petitioner reported income on the basis of a calendar and the cash method of accounting. He filed a timely income tax return for the year 1958 with the district director of internal revenue at Portland, Oregon. Petitioner went into the armored car business in Portland in the summer of 1952 and previous to September 1958 did business as Reliable Armored Car Service. Petitioner owned two armored trucks and prior to July 1958 employed two full-time employees. The two employees operated one of the trucks and handled money shipments involving in excess of $50,000. Petitioner prior to July 1, 1958, operated the other armored truck alone and handled money shipments aggregating less than $50,000. Petitioner's employees were paid according to a union scale. The business itself entailed the hauling of money between local banks and petitioner's customers. Although the customers usually signed contracts, the duration of the contracts varied from 30 days to 3 years. By July 1958 petitioner had approximately 90 customers and gross receipts of approximately $2,600 per month. Petitioner's success *35 was attributable to his honesty, his service to customers and his price-cutting practices. During the years between September 1952 and July 1958 petitioner worked 8 to 9 hours a day, 6 days a week and never took a vacation. Petitioner solicited new customers by personal contact or letters. Many of petitioner's customers were his friends. Sometime in June 1958 petitioner began experiencing shoulder, neck and arm pains and a numbness in his hands. Petitioner sought medical assistance and his condition was diagnosed as "cervical strain of hypertrophic osteoarthritic changes in the cervical spine and clavicular and scapular grating." His physician advised him to find an occupation that did not necessitate continuous lifting or to make arrangements to have someone else do it for him. On July 1, 1958, petitioner hired another full-time employee to work with him on his armored truck. During the years 1955 to September 1958 petitioner's gross receipts and net profits from his armored car business were as follows: Gross Re-
Year
ceipts
Net Profits
1955
$17,315.48
$4,775.33
1956
23,897.40
7,348.59
1957
30,116.22
9,116.19
Sept. 1958
20,940.06
3,429.18
*36 Loomis Armored Car Service, Inc., hereinafter referred to as Loomis, began operating an armored car service in Portland, Oregon, in 1925. Since that time it has expanded its operations to approximately 18 cities on the West Coast. It maintains a home office in Seattle, Washington. After petitioner commenced operations in Portland in 1952, Loomis began to lose customers to petitioner and to sustain operating losses. Between 1952 and 1957 Loomis lost 48 accounts to petitioner, and in almost every instance the rate offered these customers by petitioner was lower than the rate which Loomis had been charging them. In addition, Loomis was forced to reduce its rates to 28 of its customers to prevent them from switching to petitioner. Furthermore, although labor costs were generally rising in the Portland area during this period, Loomis was unable to raise its rates because of the competition from petitioner. During the period between 1952 and 1958, except for the year 1956 when Brinks Armored Car Service was operating in Portland, petitioner and Loomis were the only two armored car services operating in the Portland area. Soon after petitioner began experiencing a numbness in his hands, *37 he started giving thought to the sale of his armored car service. He wired Brinks Armored Car Service and asked them if they would be interested in acquiring his business. Petitioner then contacted Quentin Rochefort, the northwest division manager of Loomis, and informed Rochefort that he would be interested in selling his business for $80,000. Rochefort at this time rejected petitioner's offer and made no counteroffer on behalf of Loomis. Sometime later petitioner and Rochefort met again, and this time petitioner offered to sell his business for $60,000. Again Rochefort rejected the offer and made no counteroffer. The negotiations then reached a point where petitioner was willing to sell for $40,000 and Loomis was willing to buy for $35,000. To break the stalemate petitioner offered to sell for $37,500, with a settlement date of September 1 instead of the previously considered date of August 1. Rochefort discussed petitioner's latest offer with the officers of Loomis, and they agreed to accept petitioner's offer. The petitioner and Rochefort met on July 24, 1958, and executed a preliminary agreement which provided as follows: This Agreement between M. C. Miller, dba Reliable Armored *38 Car Service, and Loomis Armored Car Service, Inc. 1. In consideration of mutual agreements and the sum of $5,000.00 now paid, Miller agrees to sell to Loomis all assets of the business now conducted by him under the name of Reliable Armored Car Service, 1305 S. E. Belmont, Portland, Oregon, for the full purchase price of $37,500.00 payable in cash at closing, including the amount now paid. Transaction to be closed on or before September 1, 1958, when Loomis will take possession. 2. The business includes the fixed assets listed on the reverse side hereof. Also the goodwill of said business and customer contracts to be assigned, and the right to use the said business name and all operating rights. 3. Seller will deliver all assets upon closing and will execute affidavit that no debts of said business remain unpaid. 4. As a part of said purchase price, seller agrees not to compete or engage in a similar line of business as proprietor or employee of a company within a period of ten years in an area including Portland, Oregon and the territory within 150 miles radius therefrom and in any city where Loomis Armored trucks are operated. 5. This sale will be subject to the approval *39 of the Public Utilities Commission of the State of Oregon and the parties will cooperate to obtain such approval. 6. Upon obtaining such approval, Loomis will consummate said purchase and both parties hereto will sign any and all documents necessary to complete all transfers and carry out this Agreement. 7. Prior to September 1, 1958, Loomis shall have the right to examine seller's accounts and records, and seller will render all assistance possible to disclose full operations and acquaint Loomis with all particulars. After the preliminary agreement was executed, Rochefort informed petitioner that Loomis' legal department would draw up the final agreement. A few days later Rochefort called petitioner and asked him to fix a price for the tangible assets. Prior to this time the parties had not discussed the value of petitioner's tangible business assets. Although petitioner was uncertain as to their exact value and hesitated to place a value upon them, he eventually informed Rochefort that the physical assets were worth approximately $15,000. During the negotiations leading up to the execution of the preliminary agreement of July 24, 1958, petitioner and Rochefort discussed the *40 number of customers petitioner had, his gross receipts, the fact that it would be a great advantage to Loomis if petitioner was no longer in the armored car business, and the fact that no sale could be consummated unless petitioner would agree to get out of the armored car business and stay out of it. The parties did not have any discussions at this time with regard to the potential goodwill of petitioner's business or to petitioner's business reputation in the Portland area. A short time later Rochefort delivered a proposed final agreement to petitioner which had been drafted by the Loomis legal department. The proposed agreement provided, in part, that $22,500 of the total consideration of $37,500 was in payment for the petitioner's covenant not to compete. After reading the proposed agreement, petitioner informed Rochefort that he would not sign it because the $22,500 allocation was not part of their agreement. Petitioner subsequently consulted his accountant and his attorney about the proposed contract. Thereafter, Rochefort and petitioner's attorney had several conversations concerning the sum to be allocated to the covenant not to compete. No agreement could be reached by the *41 parties as to the allocation, and it was finally decided that they would go ahead with the sale, with the understanding that each party could establish his own allocation. The final purchase and sale agreement, dated August 26, 1958, provides, in pertinent part, as follows: FOR AND IN CONSIDERATION of the sum of Thirty-seven Thousand Five Hundred Dollars ($37,500.00) to be paid pursuant to the terms hereof, M. C. Miller, sole trader, d/b/a Miller-Reliable Armored Car Service in Portland, Oregon, hereinafter designated as "Seller," does hereby sell, transfer, and convey according to the terms hereof to Loomis Armored Car Service, Inc., an Oregon corporation, hereinafter designated as "Buyer", all assets of every nature and description, herein designated "assets," owned by him and being a part of said business known as Miller-Reliable Armored Car Service, and including all the existing goodwill of said business and the covenant not to compete hereinafter set forth. 1. The assets sold consist of, but are not limited to, the personal property listed in Exhibit "A" attached hereto, and include any and all other miscellaneous operating equipment pertaining to said business. 2. Seller *42 will also assign to Purchaser all agreements for customer patronage and contractual relations, whether written or oral, to the fullest extent transferable; and Purchaser agrees to assume the same and fulfill all active armored car service contracts so assigned. Purchaser shall have and retain the right to use the name of Miller-Reliable Armored Car Service, or any part thereof, so long as it may elect so to do. 3. The purchase price to be paid for said physical assets shall be the sum of Fifteen Thousand Dollars ($15,000.00). Upon the payment of said amount, Seller will execute a bill of sale and any and all other documents necessary or incidental to the transfer of ownership to Purchaser; and Seller will cause to be surrendered to the Public Utilities Commission of the State of Oregon his identification plates on said equipment sold. 4. Concurrently with the payment of the sum of Fifteen Thousand Dollars ($15,000.00) provided for in the immediately preceding paragraph, Buyer shall pay to Seller the further sum of Twenty-two Thousand Five Hundred Dollars ($22,500.00) in consideration for the aforementioned goodwill of said business and for the covenant not to compete hereinafter *43 set forth. 5. After closing of sale and delivery of property sold to Purchaser, Seller agrees that he will not, without written consent of Purchaser, establish or be engaged in or become interested in, directly or indirectly, any business, trade, or occupation involving the business of armored car service, or any phase of said business, in competition with Purchaser or any corporation with which Purchaser may be merged or affiliated for a period of ten (10) years in an area including Portland, Oregon and the territory within a one hundred fifty (150) mile radius therefrom and in any city where Loomis armored trucks are operated. 6. It is understood that the business of Seller has been conducted at 1305 S. E. Belmont, Portland, Oregon. This sale, however, does not include any real estate or tenancy rights at said location, or otherwise, and excludes the personal car of Seller which has been used in business, Seller's office furniture and fixtures, and Seller's three hand guns and holsters and one 30-30 rifle. 7. Purchaser has paid on account of said purchase price the sum of Five Thousand Dollars ($5,000.00) of which Seller acknowledges receipt. The balance of all sums payable *44 hereunder shall be payable immediately upon the execution of the within agreement and in no event later than August 30, 1958; and upon full payment, delivery will be made to Purchaser of all assets sold; and Seller will execute and deliver any and all documents necessary for the transfer of property sold and rights assigned and in fulfillment of covenants in this agreement. * * *
Petitioner delivered to Loomis (1) a list of his 88 customers as of August 1958 and (2) a bill of sale dated August 26, 1958, pertaining to the coveyance of certain itemized physical assets and reciting that a consideration of $15,000 had been paid therefor. After the sale was closed, petitioner mailed letters to his customers in which he notified them that because of illness his business had been sold to Loomis. The officers of Loomis considered the removal of petitioner's competition as the main factor for acquiring petitioner's business and would not have agreed to buy petitioner's business without a covenant not to compete. After acquiring petitioner's business, Loomis had a monopoly of the armored car service business in the Portland area. The physical assets sold by petitioner to Loomis *45 consisted of various items of personal property including 2 armored cars, 11 safes, and a small amount of office furniture. Petitioner had acquired these assets at various times. In computing depreciation thereon petitioner, at the time he acquired these assets, had estimated various useful lives for them, ranging from 5 to 15 years. Most of the assets were acquired between September 1, 1952, and July 1, 1957. Petitioner depreciated these assets on the "straight-line" method. They had an aggregate cost basis of $16,388.73 and an aggregate adjusted basis as of the beginning of 1958 of $10,454.87. Using the method of depreciation that he had consistently employed, petitioner claimed a ratable depreciation deduction on his return for 1958 based on his ownership of the assets for 8 of the 12 months in 1958. Opinion The final contract between the parties provided in part that $22,500 was being paid for petitioner's goodwill and his covenant not to compete. The principal issue in this case therefore is whether any or all of the $22,500 received by petitioner is allocable to petitioner's goodwill or to his covenant not to compete. *46 In determining whether a business possesses goodwill of appreciable value, the courts have tended to give weight to such factors as the extent of its advertising ( ; ; and ; the existence of abnormal profits ( ; ; ; and , affd. (C.A. 9, 1961)); the nature and extent of its competition ( ; and ); whether sales were largely attributable to personal contact, friendship or low prices ( ; ; ; and ); and the uniqueness or exclusiveness of the services or products dispensed (Estate of Robert R. Gannon; Francis Silberman; Estate *47 of Henry A. Maddock, all supra; and . In the instant case the record discloses that petitioner obtained most of his customers through friendship or price-cutting practices, that petitioner's services were identical to those being performed by his competitors, that petitioner did little advertising and solicited most of his customers personally, that petitioner's business did not return abnormal profits, and that petitioner was subject to strong competition from Loomis. Under such conditions we find it difficult to believe that the major portion of the sales proceeds received by petitioner can be attributed to goodwill. However, the contract between the parties clearly shows that at least part of the purchase price was paid for the purchase of goodwill. On the other hand, we think the covenant not to compete also had value. The evidence reveals that Loomis had a profitable operation in Portland until petitioner entered into the armored car business. Thereafter, principally as a result of petitioner's price cutting, Loomis lost 48 customers to petitioner and was forced to reduce its rates to 28 others. These conditions, coupled with *48 the fact that labor costs were increasing at this time, caused Loomis to sustain operating losses. Since petitioner was Loomis' only competitor in the Portland area, it is obvious that by eliminating petitioner, Loomis would not only be able to rid itself of a troublesome competitor but would be able to re-establish its monopoly in Portland. Under such circumstances, the statements by Loomis' manager that Loomis considered the removal of petitioner's competition as the main reason for acquiring the business and that the sale of the business would not have taken place without a covenant not to compete are tenable. Cf. ; , affd. (C.A. 4, 1960), certiorari denied . Having concluded that the covenant not to compete, as well as the goodwill, had value, we must now decide the exact amount to be allocated to each. Respondent contends that the entire $22,500 should be allocated to the covenant. With this we do not agree. In addition to acquiring certain physical assets worth $15,000, Loomis also *49 received an assignment from petitioner of 88 customer contracts. Furthermore, of the 88 customers represented, 40 had never been customers of Loomis before. Although we have taken into account the fact that following the acquisition of petitioner's business, Loomis obtained a monopoly in the Portland area, we, nevertheless, believe the fact that Loomis acquired new customers from petitioner indicates that it was purchasing a certain amount of petitioner's goodwill. This goodwill had some measurable value and we believe that a portion of the purchase price should be allocated to it. Furthermore, as stated previously, the contract itself specifically states that the purchaser was acquiring the goodwill of petitioner. Applying the principle announced in (C.A. 2, 1930), we have allocated one-half of the $22,500 in question to the purchase of goodwill and one-half to the covenant not to compete. (C.A. 3, 1963), affirming a Memorandum Opinion of this Court; and . Respondent, pursuant to statutory notice of deficiency, disallowed in full *50 the depreciation deductions claimed by petitioner with regard to certain depreciable assets in the year he sold them. The total amount allocated to the assets sold was $15,000, and this amount exceeded petitioner's aggregate adjusted basis in those assets as of the beginning of the year in which they were sold. Respondent contends that on the basis of these facts, the depreciation should be disallowed as a matter of law. This Court has very recently held that there is no such rule of law. . See also Smith Leasing Co., Inc. 43 T.C. - (October 20, 1964); and C. L. Nichols, 43 T.C. - (November 6, 1964). Although we cannot sustain respondent as a matter of law, the determination made in his statutory notice of deficiency is presumptively correct. Therefore, we must sustain the respondent's determination unless petitioner can demonstrate he is entitled to the depreciation claimed by him or some portion of it. Petitioner has failed to introduce any evidence tending to show that the estimates used by him in computing depreciation on the assets sold by him were accurate. Moreover, petitioner has introduced no evidence that the *51 gain realized by him on the sale of the above assets resulted from market appreciation, rather than from the claiming of excessive depreciation over the period he held these assets. Only gain due to market appreciation is taxable under section 1231. Petitioner has failed to overcome the presumptive correctness of respondent's determination. The depreciation claimed by petitioner for 1958 is therefore disallowed. Decision will be entered under Rule 50.